[Cite as *State v. Bryant*, 2022-Ohio-3669.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellee,          :

                                                Nos. 111206 and 111522

    v.                            :

EDWONTE BRYANT,                              :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED
IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:**  October 13, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-19-646608-A and CR-21-658077-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Megan Helton, Assistant Prosecuting
Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} In this consolidated appeal, defendant-appellant, Edwonte Bryant

("Bryant"), appeals from his convictions and sentence.  He raises the following

assignments of error for review:

1. Bryant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

2. The convictions were against the manifest weight of the evidence.

3. The trial court erred by imposing an indefinite sentence pursuant to the Reagan Tokes Act because it is unconstitutional, and the sentences imposed are contrary to law.

{¶ 2} After careful review of the record and relevant case law, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Procedural and Factual History

{¶ 3} On December 12, 2019, Bryant was named in a five-count indictment in Cuyahoga C.P. No. CR-19-646608-A. The indictment charged him with aggravated robbery in violation of R.C. 2911.01(A)(1), with one- and three-year firearm specifications (Count 1); robbery in violation of R.C. 2911.02(A)(2), with one- and three-year firearm specifications (Count 2); failure to comply in violation of R.C. 2921.331(B) (Count 3); having weapons while under disability in violation of R.C. 2923.13(A)(2), with forfeiture specifications (Count 4); and carrying a concealed weapon in violation of R.C. 2923.12(A)(2), with a forfeiture specification (Count 5).

{¶ 4} On October 28, 2020, Bryant retracted his former plea of not guilty and pleaded guilty to aggravated robbery, with a one-year firearm specification as amended in Count 1 of the indictment; failure to comply as charged in Count 3 of the indictment; and having weapons while under disability as charged in Count 4 of the indictment. The remaining counts were nolled.

{¶ 5} On November 17, 2020, Bryant was sentenced to a one-year term of imprisonment on the firearm specification attached to Count 1, to run prior and consecutive to a minimum three-year term of imprisonment on the underlying aggravated robbery offense. The trial court further sentenced Bryant to a nine-month term of imprisonment on the failure to comply offense, to run consecutive to Count 1, and a one-year term of imprisonment on the having weapons while under disability offense, to run concurrently with Counts 1 and 3. Pertinent to this appeal, the trial court summarized Bryant's sentence as follows:

> So this is a Reagan Tokes S.B. 201 case. You're going to have to serve the one-year prior to and consecutive to the minimum stated term. The minimum stated term is three years and nine months with a maximum term of five years and three months. That's a total stated prison term of four years, nine months; six years, three months.

(Tr. 30.)

{¶ 6} On March 30, 2021, Bryant was named in an eight-count indictment in Cuyahoga C.P. No. CR-20-658077-A. The indictment charged Bryant with rape in violation of R.C. 2907.02(A)(1)(b), with a sexually violent predator specification and a furthermore clause that the defendant "purposely compelled the victim, who was under ten years of age at the commission of the offense, to submit by force or threat of force" (Count 1); kidnapping in violation of R.C. 2905.01(A)(4), with sexual motivation and sexually-violent-predator specifications (Count 2); gross sexual imposition in violation of R.C. 2907.05(A)(4), with a sexually-violent-predator specification (Count 3); kidnapping in violation of R.C. 2905.01(A)(4), with sexual motivation and sexually-violent-predator specifications (Count 4); rape in violation

of R.C. 2907.02(A)(1)(b), with a sexually-violent-predator specification and a furthermore clause that the defendant "purposely compelled the victim, who was under ten years of age at the commission of the offense, to submit by force or threat of force" (Count 5); gross sexual imposition in violation of R.C. 2907.05(A)(4), with a sexually-violent-predator specification (Count 6); gross sexual imposition in violation of R.C. 2907.05(A)(4), with a sexually-violent-predator specification (Count 7); and gross sexual imposition in violation of R.C. 2907.05(A)(4), with a sexually-violent-predator specification (Count 8).

{¶ 7} Counts 1 and 2 of the indictment alleged that Bryant sexually assaulted the victim, D.M. (d.o.b. 03/29/2003), between January 1, 2011, and December 31, 2011. Counts 3 and 4 of the indictment alleged that Bryant sexually assaulted the victim, J.M. (d.o.b. 10/23/2004), between January 1, 2011, and December 31, 2011. Finally, Counts 5, 6, 7, and 8 of the indictment alleged that Bryant sexually assaulted the victim, C.W. (d.o.b. 10/24/2000), between January 1, 2008, and October 25, 2011.

{¶ 8} On November 1, 2021, the matter proceeded to a bench trial, where the following facts were adduced.

{¶ 9} On behalf of the state, Michael Bokmiller ("Bokmiller"), of the Cuyahoga County Division of Child and Family Services ("CCDCFS"), testified that in February 2019, he was assigned to investigate allegations of sexual abuse involving the minor child, J.M. Bokmiller specified that the circumstances that prompted his investigation pertained to a rape allegation that is unrelated to this

case. In the course of his investigation into this unrelated matter, Bokmiller questioned J.M. about her sexual history and whether she had ever been sexually assaulted in the past. At that time, J.M. revealed that when she was approximately six years old her "cousin's half-brother," later identified as Bryant, "put his private part on her privates." (Tr. 130.) Upon further inquiry, Bokmiller confirmed that Bryant had access to J.M. during the pertinent time period. Accordingly, Bokmiller reported J.M.'s allegation to the Cleveland Police Department.

{¶ 10} Detective Richard Tusing ("Det. Tusing"), of the Cleveland Police Department, testified that in March 2019, he was assigned to investigate allegations of sexual abuse involving J.M. and her older sister, D.M. In the course of his investigation, Det. Tusing separately interviewed D.M., J.M., and their mother, A.W. Det. Tusing confirmed that D.M. and J.M. each disclosed instances of sexual assault committed by Bryant. Based on the information gathered from A.W., Det. Tusing was able to narrow the date of the alleged instances of sexual abuse to a weekend in May 2011. Det. Tusing testified that A.W. was confident that D.M. and J.M.'s only exposure to Bryant was during a weekend they spent at their aunt's home while A.W. recovered from a recent hospitalization.

{¶ 11} Det. Tusing testified that he also learned from A.W. that her niece, C.W., had also reported being sexually abused by Bryant when she was a child. He explained as follows:

> When I spoke with [A.W.] on the phone, she had informed me that there was another family member who had disclosed to her that she had been molested by the same individual.

(Tr. 186-187.) In light of this information, Det. Tusing separately interviewed C.W., and documented her allegations against Bryant. Det. Tusing then collected all pertinent medical and counseling records and presented the case to the grand jury for indictment.

{¶ 12} At trial, D.M., then 18 years old, testified that when she was approximately eight years old, she and her younger sister, J.M., visited the home of their cousin, Renaja, in the summer of 2011. D.M. stated that Bryant lived in the same home as Renaja and was present at the time of the visit. D.M. explained that Bryant was Renaja's half-sibling and was not her blood relative. D.M. summarized her interaction with Bryant on the day of the visit as follows:

> It was me and my sister and we came from church and then he [Bryant] was there and he asked if we want to play a game. I said yeah. And then he took me to a room and he put a cover over my head and then that's when he put his penis in me and I said, "I don't want to play no more," so he stopped.

(Tr. 58.) When asked if she could recall specific details of the incident, D.M. stated that she remembered that she was wearing "a white shirt and a pink skirt with white polka dots on it." (Tr. 60.) D.M. explained that she remembered her outfit because Bryant asked to adjust her skirt before he covered her face with a blanket. D.M. then clarified that Bryant "put his penis" in her vagina while she was laying on a bed. (Tr. 61.) D.M. stated that she immediately told Bryant that he was hurting her and that she did not want to play the game anymore. According to D.M., Bryant then left the bedroom and went into the living room.

{¶ 13} As a result of the incident, D.M. did not "go back over Renaja's when [Bryant] was there." (Tr. 63.) However, D.M. conceded that she did not tell anyone about Bryant's conduct at the time it occurred. D.M. explained her inaction as follows:

> I really didn't know * * * like, what was going on because I was so young, but then as I got older and started thinking, I found out what happened.

(Tr. 62.) Thus, D.M. confirmed that she did not disclose the incident to her mother or the police until 2019.

{¶ 14} On cross-examination, D.M. was unable to recall whether the incident occurred during the beginning or end of the summer of 2011. However, D.M. was confident that it occurred at some point during the summer "because it was hot." (Tr. 64.) D.M. also reiterated her testimony that Bryant asked her to play a game, and took her into a nearby bedroom where he proceeded to cover her face with a blanket, remove her skirt, and put his penis in her vagina. D.M. conceded, however, that she never saw Bryant's penis and only felt something penetrate her.

{¶ 15} Regarding D.M.'s delayed disclosure of the incident to the authorities, D.M. explained that she decided to tell her mother about the incident after she learned that her younger sister, J.M., had reported instances of sexual abuse to a CCDCFS employee. Thereafter, D.M. went to the police and made a formal statement. D.M. confirmed that she asked Det. Tusing how an investigation could proceed in the absence of physical evidence or an eyewitness. She also conceded that she asked Det. Tusing, "I'm not saying that I'm lying, but what if I was?" (Tr.

74.) D.M. later explained that she posed the foregoing questions because she was concerned with whether the police could do anything because the incident "was so long ago." (Tr. 83.) D.M. restated that she was not "lying on the witness stand," and that Bryant did, in fact, "stick his penis in [her] vagina." (Tr. 84.)

{¶ 16} Defense counsel further questioned D.M. at length about her past behavior, including instances when D.M. had reported to her mother in "2009 or 2010" that she had seen faces "with no features on them." (Tr. 76.) On a separate occasion when she was seven or eight-years old, D.M. told her mother that she "saw a good witch that would tell [her] to do or say things." (Tr. 77.) D.M. testified that she saw a doctor about her visions and was prescribed a medicine. D.M. did not remember the name of the medicine she was prescribed, but confirmed that she only took the medication a "couple times" because she "didn't like the way it made [her] feel." (Tr. 79.)

{¶ 17} J.M. was 17-years old at the time of trial. J.M. identified Bryant in court and stated that she was familiar with him through her cousin, Renaja. J.M. testified that when she was six or seven years old, she and her older sister, D.M., visited Renaja at her home located in Cleveland, Ohio. J.M. recalled watching television with her sister in the living room. At some point, D.M. left the living room and walked into another room. When D.M. returned to the living room, she told J.M. that Bryant wanted to "play a game" with her in the bedroom. She described the incident as follows:

Me and my sister went to [Bryant's] house and we was sitting on the couch and I remember seeing [D.M.] get up [and], like, go somewhere and come back to the couch where I was sitting at and then that's when she told me, like, [Bryant] want to play a game or something like that, and I went in the room and then [D.M.] didn't tell me exactly, she just said a game, so I didn't think nothing of it — and I went in there and I remember laying down with a pillowcase on my head and then him rubbing his private on mine.

(Tr. 92-93.) When asked for further details, D.M. testified that once Bryant led her into the bedroom, he put a bin against the bedroom door "so that nobody [would] come in there," and had D.M. lay down on a futon. (Tr. 95.) Thereafter, Bryant "put a pillowcase on [D.M.'s] head and lifted up [her] skirt." (Tr. 95.) Bryant then rubbed his penis on "the skin of [D.M.'s] vagina." (Tr. 96.) D.M. testified that when she felt Bryant touch her private area, she expressed that she "did not want to play this game anymore." (Tr. 96.) D.M. testified that she returned to the living room but did not tell anyone about what Bryant had done to her in the bedroom. D.M. stated that she first disclosed the incident while speaking with a counselor in 2019. Thereafter, D.M. spoke to her mother about the incident, and CCDCFS and the police were contacted.

{¶ 18} On cross-examination, J.M. stated that she believed the incident involving Bryant occurred in the winter of 2010 or 2011, because she "remember[ed] it being cold outside." (Tr. 100.) J.M. could not recall whether she told the investigating detectives about Bryant placing bins in front of his bedroom door before the incident took place. However, she maintained that she consistently disclosed to her counselor, her mother, the prosecutor, and the investigating

detectives that Bryant rubbed his penis on her vagina. J.M. was questioned at length about her delayed disclosure of the incident. J.M. explained that she began speaking to a counselor to address behavioral concerns and issues relating to her relationship with her mother. J.M. testified that she disclosed Bryant's actions while speaking to a counselor about an unrelated incident of sexual abuse.

{¶ 19} C.W. was 21 years old at the time of trial. C.W. testified that she is cousins with D.M., J.M., and Renaja. C.W. testified that she was close with Renaja when they were younger and would often spend the night at her home. C.W. stated that when she was approximately six years old, Bryant began molesting her when she slept over. (Tr. 160.) According to C.W., Bryant first started touching her inappropriately while she was asleep in Renaja's bedroom. She explained that she would wake up with her pants down and Bryant touching various parts of her body, including her "thighs, vagina, and butt." (Tr. 161.) C.W. clarified that Bryant would touch her with either his penis or his hand and would leave the bedroom once she woke up.

{¶ 20} In addition to the instances occurring during sleepovers at Renaja's house, C.W. testified that Bryant inappropriately touched her in her own home when she was in the fourth grade. She described this incident as follows:

> We were playing hide and seek. I went to hide in the closet. He came after me and he pulled my pants down and put his penis against, like, the back of my thigh, my lower butt area.

(Tr. 164.)

{¶ 21} C.W. estimated that the abuse occurred from the time she was six years old until her "early teenage years." (Tr. 163.) Thus, C.W confirmed that between the years of 2006 and 2011 or 2012, Bryant had touched her inappropriately on "multiple occasions." (Tr. 163.) C.W. testified that she did not speak to anyone about the sexual abuse until she disclosed the incidents to her aunt, A.W., when she was 18 years old. She explained that she felt comfortable disclosing the sexual abuse at that time because she was older and "had a better support system." (Tr. 169.) After A.W. contacted the police, C.W. agreed to meet with Det. Tusing and a victim advocate.

{¶ 22} At the close of the state's case-in-chief, the trial court granted Bryant's Crim.R. 29 motion for acquittal as it pertained to Count 5 of the indictment. (Tr. 208-209.) The motion was denied as to the remaining counts.

{¶ 23} At the conclusion of trial, Bryant was found guilty of sexual battery, a lesser-included offense of rape (Count 1); and four counts of gross sexual imposition (Counts 3, 6, 7, and 8). The court further found Bryant guilty of the sexually-violent-predator specifications attached to Counts 1, 3, 6, 7, and 8. Bryant was found not guilty of each kidnapping offense (Counts 2 and 4).

{¶ 24} On December 16, 2021, the trial court imposed an aggregate prison term of five years in Case No. CR-20-658077-A, to run concurrently with the prison term imposed in Case No. CR-19-646608-A. The court further found Bryant to be a Tier III sex offender on Count 1, and a Tier II sex offender on Counts 3, 6, 7, and 8. The sentence was journalized in an entry dated December 18, 2021.

{¶ 25} On December 21, 2021, the trial court held a hearing to clarify the sentence "in regard to [Case No. CR-19]-646608-A." At the onset of the hearing, the prosecutor made the following statement on the record:

> In regard to Case 646608, the defendant was sentenced to a term of incarceration for a one-year firearm specification as well as nine months on a failure to comply count as well. By operation of law, those have to be run consecutive to each other, first of all, and the gun spec has to be served first and the sentence in this case would have to run consecutive to that portion of his sentence in 646608.
>
> So, at this time, it is the State's understanding that effectively the five-year prison sentence has to be run consecutive to that portion of the sentence, making his total time of incarceration six years and nine months.

(Tr. 249-250.)

{¶ 26} Upon noting defense counsel's objection to the resentencing hearing, the court stated, in pertinent part:

> All right. So to be clear; in Case 658077, I sentenced you to a total of five years. Count 1 was five years on sexual battery, a felony of the second degree; Count 3 was gross sexual imposition, a felony of the third degree, I sentenced you to 36 months to be concurrent to Count 1; Count 6 was gross sexual imposition, a felony of the third degree, I sentenced you to 36 months concurrent; Count 5 was gross sexual imposition, a felony of the third degree, and I sentenced you to 36 months concurrent to all those counts; and Count 8, gross sexual imposition, a felony of the third degree, I sentenced you to 36 months to run concurrent to all other counts. That's a total of five years.
>
> Now, in regard to Case 646608, it is true that you plead[ed] guilty to a one-year firearm specification, that would need to be run prior to and consecutive to the underlying sentence, and you also plead[ed] guilty to failure to comply, a felony of the third degree. That also needs to be run concurrent [sic]. So, in essence, as the assistant county prosecutor, * * *, relayed for the record, you will be serving a total of six years and nine months.

You also do need, and this was all said on the record prior, to register as a Tier III sex offender.

(Tr. 250-251.)

{¶ 27} On January 4, 2022, the trial court issued a nunc pro tunc journal entry in Case No. CR-20-658077-A, clarifying that the aggregate prison term imposed in Case Nos. CR-19-646608-A and CR-20-658077-A "is 6 years, 9 months."

{¶ 28} Bryant now appeals from his convictions and sentence.

## II. Law and Analysis

### A Sufficiency of the Evidence

{¶ 29} In his first assignment of error, Bryant argues the trial court erred in denying his Crim.R. 29 motion for acquittal when the state produced insufficient evidence as a matter of law to support his convictions in Case No. CR-20-658077-A. Bryant contends that "the lack of evidence, significant inconsistencies, and indication that the allegations were likely fabricated, merited a dismissal of all charges pursuant to Crim.R. 29."

> Pursuant to Crim.R. 29(A), a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Because a Crim.R. 29 motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence."

*Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 30} When assessing a challenge to the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether

such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 31} Relevant to this appeal, it is well settled that "physical evidence is not required to establish a defendant's guilt beyond a reasonable doubt." *State v. Lopez*, 8th Dist. Cuyahoga No. 94312, 2011-Ohio-182, ¶ 62. Circumstantial and direct evidence "possess the same probative value." *Jenks* at 272. Thus, "witness testimony alone is sufficient to convict someone of a crime." *State v. Bradley*, 8th Dist. Cuyahoga No. 108983, 2020-Ohio-3460, ¶ 34, citing *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 37 ("eyewitness identification alone is sufficient to support a conviction — even where discrepancies exist — so long as a reasonable juror could find the eyewitness testimony to be credible").

### 1. Venue

{¶ 32} Preliminarily, Bryant contends the state failed to sufficiently establish the venue of the offenses, arguing that "no one identified the location of the incidents other than to say it was somewhere in Cleveland." We disagree.

{¶ 33} Venue is not a material element of any crime, but is a fact that must be proven beyond a reasonable doubt. *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). It is "not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the indictment." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 19, quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus.

{¶ 34} In this case, the evidence conclusively established that the alleged instances of sexual abuse committed against D.M., J.M., and C.W., either occurred in Bryant's home or in C.W.'s home. At trial, D.M., J.M., and C.W. each testified that Bryant's home was located within Cleveland, Ohio. (Tr. 59, 92, 157.) C.W. further confirmed that she lived in Cuyahoga County, Ohio at the time Bryant inappropriately touched her in her home. (Tr. 163.) Under these circumstances, we find the evidence was sufficient to establish that the alleged offenses occurred in Cuyahoga County, Ohio.

## 2. Sexual Battery

{¶ 35} With respect to D.M., Bryant was convicted of sexual battery in violation of R.C. 2907.03(A)(1) (Count 1). Sexual battery by coercion under R.C. 2907.03(A)(1) is the lesser-included offense of rape. *State v. Johnson*, 112 Ohio St. 3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 268. Sexual battery requires proof that the offender engaged in "sexual conduct" with another who is not his spouse by

"knowingly coerc[ing] the other person to submit by any means that would prevent resistance by a person of ordinary resolution." R.C. 2907.03(A)(1).; *State v. Parker*, 8th Dist. Cuyahoga No. 110563, 2022-Ohio-377, ¶ 15.

{¶ 36} R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." Further, "[a] person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶ 37} Pursuant to R.C. 2907.01(A), the term "sexual conduct" includes the following:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 38} The Revised Code does not define "coercion" or "ordinary resolution." When the General Assembly does not define a word or phrase, that word or phrase is given its ordinary meaning. *State v. Taylor*, 8th Dist. Cuyahoga No. 78383, 2001 Ohio App. LEXIS 2513, 8 (June 7, 2001). "As used in the context of R.C. 2907.03(A)(1), resolution means a firmness of purpose [and] an ability to resist coercion." *Id.* As provided by the commentary to R.C. 2907.03, sexual conduct by coercion is broader than sexual conduct by force, does not require proof of force, and "'necessarily includes all uses of force.'" *State v. Ford*, 8th Dist. Cuyahoga No.

107541, 2019-Ohio-2570, ¶ 21, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 386, 415 N.E.2d 303 (1980).

{¶ 39} The Ohio Supreme Court has defined "coercion" to include "'a compulsion brought about by moral force or in some other manner with or without physical force,'" and has explained that it is an "'essential characteristic of coercion'" that "'force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the [victim] so that [s]he acted other than [s]he ordinarily would have acted in the absence of those influences.'" *Ford* at ¶ 22, quoting *State v. Woods*, 48 Ohio St.2d 127, 137, 357 N.E.2d 1059 (1976). The Ohio Supreme Court has also recognized that "[f]orce need not be overt and physically brutal, but can be subtle and psychological." *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988).

{¶ 40} Ohio courts have further described the definition of coercion as follows:

> "Coercion for purposes of sexual battery has been defined as 'to compel by pressure.' *See In re Jordan*, 9th Dist. Lorain No. 01CA007804, 2001 Ohio App. LEXIS 4013 (Sept. 12, 2001). Webster's Third New International Dictionary (1993) defines 'to coerce' in relevant part as 'to restrain, control, or dominate, nullifying the individual will or desire,' 'to compel to an act by force, threat, or other pressure,' and 'to bring about * * * by force, threat, or other pressure.' *Id*. at 439. Black's Law Dictionary (5th Ed.1979), in turn, states that coercion 'may be actual, direct, or positive, as where physical force is used to compel [an] act against one's will, or implied, legal, or constructive, as where one party is constrained by subjugation to [an]other to do what his free will would refuse.' *Id*. at 234."

*State v. Watters*, 8th Dist. Cuyahoga No. 110697, 2022-Ohio-1670, ¶ 20, quoting *Ford* at ¶ 23; *see also In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746.

{¶ 41} In this case, D.M. testified that in the summer of 2011, she and her younger sister, J.M., went to their cousin's home one afternoon after church. D.M. stated that she was with her sister and their cousin, Renaja, in the living room when Bryant convinced her to follow him into a nearby bedroom to play. Once inside the bedroom, Bryant, then 16 or 17 years old, instructed D.M., then eight-years old, to lay on the bed. Under the false pretense that they were playing a game, Bryant placed a blanket over D.M.'s face so that she could not see what he was doing. Bryant then, without warning, penetrated D.M.'s vagina with his penis. D.M. immediately asked Bryant to stop, stating that he was hurting her.

{¶ 42} Viewing this evidence in a light most favorable to the prosecution, we find there was sufficient evidence to permit the trier of fact to convict Bryant of sexual battery. In this case, the record demonstrates that Bryant knowingly compelled D.M. to endure sexual conduct by means so fundamentally inappropriate that D.M. did not fully comprehend what had occurred until she was old enough to understand the nature of Bryant's actions. Bryant took unconscionable advantage of D.M.'s innocence, and used a combination of factors, including deceit, manipulation, and subtle force, to place D.M. in a vulnerable and defenseless position. Specifically, Bryant nullified D.M.'s individual will by misleading her into thinking that she was playing a game with Bryant at the time he led her into a

bedroom, covered her face with a blanket, and moved her skirt to engage in vaginal intercourse with the eight-year old victim. Under these circumstances, we find D.M.'s testimony, if believed, demonstrates that Bryant coerced her to submit to sexual conduct by means that would cause a person of ordinary resolution to submit to acts that her free will might otherwise resist. *See State v. Franklin*, 9th Dist. Summit No. 29071, 2019-Ohio-1513, ¶ 20 ("R.C. 2907.03 was enacted with the purpose to 'forbid sexual conduct with a person other than the offender's spouse in a variety of situations where the offender takes unconscionable advantage of the victim[.]'"), quoting Legislative Service Commission 1973 comment to R.C. 2907.03.

### 3. Gross Sexual Imposition

{¶ 43} Bryant was further convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4) (Counts 3, 6, 7, and 8). The statute provides, in relevant part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 44} R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." The Ohio Revised Code does not define "sexual arousal" or sexual "gratification." However, R.C. 2907.01(B) "'contemplate[s] any touching of the described areas which a reasonable person

would perceive as sexually stimulating or gratifying.'" *State v. Tate*, 8th Dist. Cuyahoga No. 98221, 2013-Ohio-370, ¶ 18, quoting *State v. Astley*, 36 Ohio App.3d 247, 250, 523 N.E.2d 322 (10th Dist.1987); *see also In re Anderson*, 116 Ohio App.3d 441, 443, 688 N.E.2d 545 (12th Dist.1996).

> In determining whether sexual contact occurred, the trier of fact may infer from the evidence presented at trial whether the defendant's contact with the areas of the body outlined in R.C. 2907.01 was for the purpose of sexual arousal or gratification. *Tate; State v. Cobb*, 81 Ohio App.3d 179, 185, 610 N.E.2d 1009 (9th Dist.1991). The purpose of the contact may be inferred from the type, nature, and circumstances of the contact. *Tate* at ¶ 20, citing [*State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-Ohio-2664]; *see also Ohio v. Coleman*, 8th Dist. Cuyahoga No. 102291, 2015-Ohio-4491, ¶ 7 (finding that purpose may also be inferred from the defendant's conduct as well as his or her personality). Accordingly, "[i]f the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *Cobb* at 185.

*State v. Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, ¶ 65.

{¶ 45} In this case, Count 3 of the indictment stemmed from allegations that Bryant "touched [J.M.]'s vagina with his penis" when J.M. was under the age of 13. At trial, J.M. testified that when she was approximately six or seven years old, she followed Bryant into his bedroom "to play a game or something like that." (Tr. 92-93.) Once inside the bedroom, Bryant barricaded his door to prevent anyone from entering and had J.M. lay down on a futon. Bryant then covered J.M.'s face with a pillowcase, removed her underwear, and rubbed his penis on J.M.'s vagina. J.M. testified that Bryant touched her for approximately two minutes before she stated that she did not want to play the game anymore.

{¶ 46} Regarding C.W., Counts 6, 7, and 8 of the indictment stemmed from allegations that Bryant inappropriately touched C.W. on separate occasions when she was under the age of 13, to wit: (1) touching her vagina, (2) touching her leg with his penis, and (3) touching her buttocks or thigh. At trial, C.W. testified that she was repeatedly molested by Bryant when she was between the ages of six years old and an early teenager. C.W. testified that the majority of the sexual abuse occurred while she was sleeping in a bed located within Bryant's home. C.W. explained that she would often wake up in the midst of the assault and discover that Bryant had removed her pants and underwear and was touching her buttocks, vagina, or thighs, with either his hands or his penis. The sexual abuse was not limited to sleepovers at Bryant's home. On a separate occasion, C.W. was playing hide and seek with her friends in her home when Bryant encountered her while she was hiding inside a closet. C.W. testified that Bryant removed her pants and underwear and pressed his penis against her lower buttocks.

{¶ 47} Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that Bryant engaged in "sexual contact" when he rubbed J.M.'s vagina with his penis, and touched C.W.'s thighs, buttocks, and vagina with his hands and/or penis. There is no dispute that the victims' thighs, genitals, and buttocks constitutes "erogenous zones" under R.C. 2907.01(B). Furthermore, the manner and circumstances of Bryant's contact with each victim, including the secrecy in which Bryant touched their erogenous zones with both his hands and penis, was sufficient to allow the trial court to infer that

Bryant's touching of the victim was motivated by desires of sexual gratification. *See Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, at ¶ 68, citing *Tate*, 8th Dist. Cuyahoga No. 98221, 2013-Ohio-370, at ¶ 23, and *In re Anderson*, 116 Ohio App.3d at 443, 688 N.E.2d 545. Finally, we find sufficient evidence supports the state's allegations that the victims were not the spouse of Bryant and were under the age of 13 at the time of each offense. As stated, J.M. consistently testified that she was six or seven years old at the time Bryant lured her into his bedroom and inappropriately touched her in a sexual manner. Similarly, C.W. testified that Bryant began molesting her during sleepovers at his home when she was six years old. She further testified that the incident occurring inside a closet at her home took place when she was in the fourth grade — or nine or ten years old. (Tr. 166.) Accordingly, we find Bryant's convictions for gross sexual imposition were supported by sufficient evidence.

{¶ 48} Bryant's first assignment of error is overruled.

### B. Manifest Weight of the Evidence

{¶ 49} In his second assignment of error, Bryant argues his convictions in Case No. CR-20-658077-A are against the manifest weight of the evidence.

{¶ 50} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12, citing *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (1997). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court

functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 51} Demeanor evidence is invaluable in assessing a witness's credibility, yet it is totally lost in transmission to the court of appeals. "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 4 (Aug. 22, 1997). Although we have the discretionary power of a "thirteenth juror" to grant a new trial, that power "'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 547, quoting *Martin* at 175.

{¶ 52} In addition, a trier of fact is free to believe all, some or none of the testimony of each witness testifying at trial. *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85; *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100. Thus, a conviction is not against the manifest weight of the evidence "solely because the jury heard inconsistent or contradictory testimony." *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38; *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.) ("A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory."); *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996).

{¶ 53} Finally, we note that "[a] conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed." *See, e.g., State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 84 (4th Dist.).

{¶ 54} On appeal, Bryant repeatedly references the nature of the delayed disclosures in this case and unfairly speculates that the victims, who were relatives, "clearly discussed their stories and coordinated the facts." Bryant further contends that the testimony of D.M., J.M., and C.W. contained significant inconsistencies that "call the credibility of the witnesses into serious question." In support of his position, Bryant states that D.M. testified that the incident occurred in the summer of 2011, while J.M. recalled the incident occurring during the winter. Bryant submits that this conflicting testimony coupled with J.M.'s questions to Det. Tusing about the lack of physical evidence "should give this court great pause in affirming these convictions."

{¶ 55} Finally, Bryant contends that evidence relating to the victims' past behavior conclusively demonstrates that their allegations of abuse lack credibility. Specifically, Bryant suggests that D.M.'s memory must be scrutinized due to her reports of speaking with a witch and seeing people with no facial features during the pertinent time period. Bryant similarly cites to J.M.'s admissions that she had behavioral issues in the past and would not be surprised if her records indicated that she was previously untruthful with her counselors. Bryant summarizes his position as follows:

> It is possible that the difficulties and circumstances the women were experiencing in their lives (that were totally unrelated to [Bryant]) contributed to the women making these accusations against [Bryant] 10 years later. While respecting the circumstances of mental health, it must be considered that the delayed disclosures against [Bryant] are grounded in suggestion and imagination rather than reality. Given these emotional and mental health factors, that were confirmed by the

woman's testimony, the state needed some disinterested party or evidence to corroborate these serious charges against [Bryant] to support the convictions. There is no physical evidence supporting the allegations. The weight of the evidence, when each charge is considered separately, weighs against conviction and Bryant's convictions should be reversed and remanded for a new trial.

{¶ 56} After careful review of the record in its entirety, we find Bryant's sexual battery and gross-sexual imposition convictions are not against the manifest weight of the evidence. In this case, each victim was thoroughly questioned about the alleged instances of abuse and the circumstances that caused them to refrain from disclosing the incidents to an authority figure. Each victim was further cross-examined about perceived inconsistencies in their testimonies and forced to acknowledge pertinent aspects of their childhood, including behavioral- and mental-health concerns, in an attempt to impeach their credibility or otherwise suggest that the victim's coordinated their testimony. Thus, the trier of fact was presented with all relevant facts and was in the best position to weight the victims' individual testimony. As stated, the trier of fact was free to believe all, some, or none of the testimony of each witness testifying at trial. In this regard, we find D.M., J.M., and C.W. each provided consistent, credible accounts of their personal experiences with Bryant and the specific sexual acts he engaged in with them against their will. Bryant's pattern of conduct and his manipulation of each victim for his own sexual gratification is readily apparent on this record. Weighing the evidence and all reasonable inferences that may be drawn therefore, we cannot say this is the

exceptional case where the trier of fact lost its way and created such a manifest injustice that Bryant's convictions must be reversed, and a new trial ordered.

{¶ 57} Bryant's second assignment of error is overruled.

## C. Reagan Tokes Law

{¶ 58} In his third assignment of error, Bryant argues the trial court erred by imposing an indefinite sentence in Case No. CR-19-646608-A pursuant to the Reagan Tokes Law. He contends the Reagan Tokes Law is unconstitutional because it violates the state and federal constitutional provisions for separation of powers, due process, and equal protection.

{¶ 59} Alternatively, Bryant argues the trial court did not properly impose the indefinite portion of the Reagan Tokes sentence in Case No. CR-19-646608-A. He contends "the court's explanation regarding the total sentence was confusing and inaccurate because it was done in terms of an aggregate sentence rather than with regard to the specific count to which the indefinite sentence applied."

{¶ 60} Finally, Bryant argues the trial court erred when it reconvened after imposing the sentence in Case No. CR-20-658077-A, to clarify that Bryant would be serving a total sentence in both cases of six years and nine months.

{¶ 61} We address each of the foregoing arguments separately for the ease of discussion.

## 1. Constitutionality of the Reagan Tokes Law

{¶ 62} Preliminarily, we find no merit to the constitutional challenges raised within this assigned error. The question of whether the Reagan Tokes Law is

constitutional was decided in this court's en banc opinion in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.). There, this court found "that the Reagan Tokes Law, as defined under R.C. 2901.011, is not unconstitutional," and reaffirmed the principles established in *State v. Gamble*, 2021-Ohio-1810, 173 N.E.3d 132 (8th Dist.); *State v. Simmons*, 2021-Ohio-939, 169 N.E.3d 728 (8th Dist.); and *State v. Wilburn*, 2021-Ohio-578, 168 N.E.3d 873 (8th Dist.). *See Delvallie* at ¶ 17. Because Bryant does not advance any novel argument left unaddressed by the *Delvallie* decision, we find the constitutional challenges presented in this appeal are without merit.

### 2. Application of the Reagan Tokes Law

{¶ 63} R.C. 2953.08 "specifically and comprehensively defines the parameters and standards — including the standard of review — for felony-sentencing appeals." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21. Under R.C. 2953.08(G)(2), an appellate court "may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter * * * for resentencing" if it "clearly and convincingly finds either of the following":

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

{¶ 64} "A sentence is contrary to law if it falls outside the statutory range for the offense or if the sentencing court fails to consider the purposes and principles of

sentencing set forth in R.C. 2929.11 and the sentencing factors in R.C. 2929.12." *State v. Angel*, 8th Dist. Cuyahoga No. 110456, 2022-Ohio-72, ¶ 8, citing *State v. Pawlak,* 8th Dist. Cuyahoga No. 103444, 2016-Ohio-5926, ¶ 58.

{¶ 65} On appeal, Bryant suggests that the trial court's application of the Reagan Tokes Law in Case No. CR-19-646608-A was contrary to law because the trial court failed to clearly state the minimum and maximum prison term applicable to his qualifying felony offense pursuant to R.C. 2929.14 and 2929.144(B). We disagree.

{¶ 66} The General Assembly enacted the Reagan Tokes Law in Am.Sub.S.B. No. 201, which went into effect on March 22, 2019. The Reagan Tokes Law applies to "qualifying felonies," which are felonies "of the first or second degree committed on or after March 22, 2019." R.C. 2929.144(A). When a prison sentence is imposed on such a "qualifying felony," the statute requires the trial court to impose an indefinite prison term with a stated minimum term and a calculated maximum term. R.C. 2929.14(A)(1)(a); R.C. 2929.14(A)(2)(a); R.C. 2929.144.

{¶ 67} "Under Ohio law, a sentencing court 'must consider each offense individually and impose a separate sentence for each offense.'" *State v. Monroe*, 2d Dist. Clark No. 2018-CA-124, 2020-Ohio-597, ¶ 47, quoting *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 9 (rejecting a sentence packaging approach to sentencing). "A sentencing court thus 'lacks the authority to consider the offenses as a group and to impose only an omnibus sentence for the group of

offenses.'" *State v. Smith*, 2d Dist. Montgomery No. 28265, 2019-Ohio-5015, ¶ 66, quoting *Saxon* at ¶ 9.

{¶ 68} Consistent with this approach, when imposing a prison sentence under the Reagan Tokes Law, the trial court first must select, for each offense, a stated minimum term from the appropriate statutory range for either a first- or second-degree felony, unless a specific penalty applies. R.C. 2929.14(A)(1)(a); R.C. 2929.14(A)(2)(a). For felonies that do not fall within the Reagan Tokes Law, the trial court imposes a definite prison term from the appropriate statutory range. Next, after determining whether to impose concurrent or consecutive sentences, the trial court must calculate the maximum term using the methodology provided in R.C. 2929.144(B).

{¶ 69} As previously discussed, in Case No. CR-19-646608-A, Bryant pleaded guilty to aggravated robbery, a felony of the first degree; failure to comply, a felony of the third degree; and having weapons while under disability, a felony of the third degree. Consistent with the foregoing, the trial court was required to impose a definite sentence on the nonqualifying third-degree felony offenses in accordance with the sentencing structure outlined by R.C. 2929.14(A)(3). In turn, because Bryant was convicted of a qualifying first-degree felony offense, the trial court was required to impose a sentence in accordance with the sentencing structure outlined in R.C. 2929.14(A)(1)(a). The statute provides, in pertinent part:

> For a felony of the first degree committed on or after the effective date of this amendment, the prison term shall be an indefinite prison term with a stated minimum term selected by the court of three, four, five,

six, seven, eight, nine, ten, or eleven years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code * * *.

{¶ 70} Contrary to Bryant's suggestion on appeal, the record reflects that the trial court carefully considered the applicable sentencing ranges for each qualifying and nonqualifying offense pursuant to R.C. 2929.14(A), and separately imposed a term of imprisonment on each count. The court summarized the individual sentences as follows:

> [O]n Count 1, I sentence you to one-year gun specification that needs to be served prior and consecutive to the underlying felony. On the aggravated robbery, I sentence you to three years. On the failure to comply, that has to be served consecutive to the other prison term, I sentence you to nine months. Having weapons under disability, I sentence you to nine months and that needs to be served concurrent to the rest of the sentence.

(Tr. 29-30.)

{¶ 71} Because the trial court ordered "some or all of the prison terms imposed" to be served consecutively, the calculation of the applicable maximum term is governed by R.C. 2929.144(B)(2). To determine the maximum term under that provision, the trial court must first "add all of the minimum terms imposed on the offender * * * for a qualifying felony * * * and all of the definite terms of the felonies that are not qualifying felonies * * * that are to be served consecutively." R.C. 2929.144(B)(2). The maximum term equals the sum of those prison terms "plus fifty per cent of the longest minimum term or definite term for the most serious felony being sentenced." *Id.*

{¶ 72} We further note that because Bryant was sentenced to a one-year term of imprisonment on the firearm specification attached to Count 1, the trial court was

required to comply with R.C. 2929.14(C)(1)(a). In relevant part, the statute provides that a mandatory prison term imposed on a firearm specification must be served "consecutively to and prior to any prison term imposed for the underlying felony * * *, and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender."

{¶ 73} Applying the foregoing statutory provisions to the circumstances of this case, the trial court summarized Bryant's sentence and its application of the Reagan Tokes Law as follows:

> So this is a Reagan Tokes Senate Bill 201 case. Let me explain. You're going to have to serve the one-year [firearm specification] prior and consecutive to the minimum stated term. The minimum stated term is three years and nine months with a maximum term of five years and three months.

(Tr. 30.)

{¶ 74} After careful review of the record in Case No. CR-19-646608-A, we find the trial court adequately complied with the requirements of the Reagan Tokes Law. Pursuant to R.C. 2929.14(A)(1)(a), the trial court imposed a minimum selected term of three years on the qualifying first-degree felony offense of aggravated robbery. The trial court further imposed definitive prison terms that fell within the applicable sentencing range on the nonqualifying felony offenses of failure to comply and having weapons while under disability. Because the trial court ordered the sentence imposed on the aggravated robbery conviction to run consecutive to the sentence imposed on the failure to comply conviction, the trial court then added the minimum selected term of three years with the definite term of nine months, for

an aggregate minimum term of three years and nine months in prison. To calculate the maximum term pursuant to R.C. 2929.144(B)(2), the court added fifty percent of the longest minimum term for the most serious felony offense, or 18 months, to the aggregate minimum term, for an indefinite prison term of three years, nine months to five years, three months. Finally, the trial court correctly ordered the one-year firearm specification attached to the aggravated robbery conviction to run prior and consecutive to the sentence imposed on the underlying felony offense. R.C. 2929.19(C)(1)(a); R.C. 2929.144(B)(4). Under these circumstances, we are unable to conclude that the sentence imposed in Case No. CR-19-646608-A is contrary to law.

{¶ 75} To the extent Bryant suggests the court's summarization of his sentence was "confusing," we reiterate that when imposing prison terms in accordance with the Reagan Tokes Law, trial courts are encouraged "to draft the sentencing entry according to the express dictates of the relevant statutory scheme and adhere to the statutory language therein." *See State v. Scott*, 8th Dist. Cuyahoga No. 109689, 2022-Ohio-1486, ¶ 30 (S. Gallagher, A.J., concurring). "The goal is to clearly articulate the intended sentence in a manner that avoids the need to interpret the sentence and to use the language of the statutory sentencing scheme instead of colloquially understood phrases that potentially conflict with statutory language." *Id.* at ¶ 32.

{¶ 76} Finally, we are obligated to note that the sentencing journal entry in Case No. CR-19-646608-A does not reflect the sentence imposed by the trial court

during the sentencing hearing. Contrary to the court's statement that the one-year firearm specification was to run prior and consecutive to an aggregate minimum term of three years and nine months, and a maximum term of five years and three months, the sentencing journal entry provides as follows:

> The trial court imposes a prison term of 1 year(s) on the firearm specification(s) to be served prior to and consecutive with a minimum prison term of 4 year(s), 9 month(s) and a maximum prison term of 6 year(s), 4 month(s) on the underlying offense(s).

{¶ 77} On remand, the trial court is ordered to issue a nun pro tunc journal entry to adequately reflect the sentence imposed at the time of sentencing.

### 3. Calculation of Aggregate Sentences in Case Nos. CR-19-646608-A and CR-20-658077-A

{¶ 78} On December 21, 2021, the trial court held a hearing to clarify that by running the aggregate sentence imposed in Case No. CR-20-658077-A concurrently to the aggregate sentence imposed in Case No. CR-19-646608-A, Bryant would be required to serve "a total of six years and nine months" in prison. (Tr. 251.) The trial court explained that sentences imposed on the one-year firearm specification and failure to comply offense in Case No. CR-19-646608-A, were required to run prior and consecutive to the five-year prison term imposed in CR-20-658077-A, as a matter of law.

{¶ 79} On appeal, Bryant argues a total sentence of six years and nine months is inconsistent with the court's decision to run the five-year sentence imposed in Case No. CR-20-658077-A concurrently with the sentence imposed in Case No. CR-19-646608-A. For the reasons that follow, we find merit to Bryant's position.

{¶ 80} Regarding the one-year firearm specification attached to the aggravated robbery offense in Case No. CR-19-646608-A, it is well settled that the sentence for a firearm specification must be served consecutively to and prior to the sentence that is imposed for the underlying felony. R.C. 2929.14(C)(1)(a); *State v. Moore*, 154 Ohio St.3d 94, 2018-Ohio-3237, 111 N.E.3d 1146, ¶ 8. R.C. 2929.14(C)(1)(a) also states that a sentence for a firearm specification must be served "consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender." Thus, as a matter of law, the one-year firearm specification imposed in Case No. CR-19-646608-A was required to run consecutively to the aggregate sentence imposed in Case No. CR-20-658077-A. The express language of R.C. 2929.14(C)(1)(a) therefore supports the trial court's clarifying statement during the December 21, 2021 hearing that Bryant would have to serve the one-year sentence imposed on the firearm specification in Case No. CR-19-646608-A before the aggregate sentence imposed in Case No. 20-658077-A could commence. *See State v. Kibble*, 8th Dist. Cuyahoga No. 104173, 2016-Ohio-8573, ¶ 8; *State v. Owens*, 5th Dist. Richland No. 09CA128, 2010-Ohio-6004, ¶ 13; *State ex rel. Gilbert v. Gansheimer*, 11th Dist. Ashtabula No. 2011-A-0600, 2011-Ohio-5599, ¶ 12.

{¶ 81} With respect to Bryant's failure to comply conviction, R.C. 2921.331(D) required him to "serve the prison term consecutively to any other prison term or mandatory prison term imposed upon the offender." Ohio courts have recognized that

[t]he language of R.C. 2921.331(D) requires a sentence for failure to comply to be served consecutively to any other sentence. The statute does not limit itself to sentences imposed at the time of the failure-to-comply conviction. Any potential ambiguity in R.C. 2921.331(D) is clarified by R.C. 2929.14(C)(3), which provides: "If a prison term is imposed for * * * a felony violation of division (B) of section 2921.331 of the Revised Code, the offender shall serve that prison term consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender."

*State v. Rose*, 2d Dist. Champaign No. 2020-CA-28, 2021-Ohio-2859, ¶ 5; *see also State v. White*, 2d Dist. Montgomery No. 28338, 2020-Ohio-5544, ¶ 67; R.C. 2921.331(D); *State v. McComb*, 2d Dist. Champaign No. 2015-CA-17, 2016-Ohio-606, ¶ 5, 13-14; *State v. Smith*, 8th Dist. Cuyahoga No. 108379, 2020-Ohio-914, ¶ 10; *State v. Cover*, 8th Dist. Cuyahoga No. 109959, 2021-Ohio-1303, ¶ 6. Thus, the mandates of R.C. 2921.331(D) further supported the court's clarifying statements on December 21, 2021, that the nine-month prison term imposed on the failure to comply offense in Case No. CR-19-646608-A was required, by operation of law, to run consecutively to the sentences imposed in Case No. CR-20-658077-A.

{¶ 82} Consistent with the foregoing, this court acknowledges that the clarifying statements made by the trial court on December 21, 2021, conform with the express language of the applicable sentencing statutes. With that said, however, the record demonstrates that the trial court did not comply with R.C. 2929.14(C)(1)(a) or 2921.331(D) at the time it imposed Bryant's sentence in Case No. CR-20-658077-A and ordered the aggregate five-year prison term to run "concurrently" with the sentence imposed in Case Nos. CR-19-646608-A. Both the sentencing transcript and the sentencing journal entry are silent concerning the

sentencing implications of the firearm specification and failure to comply conviction in Bryant's prior case  Under these circumstances, we find the trial court's attempt to clarify Bryant's sentence on December 21, 2021, amounted to an attempt to correct or modify Bryant's sentence in Case No. CR-20-658077-A.

{¶ 83} Prior to 2020, the trial court's alteration of Bryant's sentence in this case would have been appropriate based on the well-settled principle that courts retain continuing jurisdiction to correct a void sentence or to correct clerical errors in judgments. *State ex rel. Cruzado v. Zaleski*, 111 Ohio St.3d 353, 2006-Ohio-5795, 856 N.E.2d 263, ¶ 19. *See, e.g., State v. Wells*, 11th Dist. Ashtabula No. 2013-A-0014, 2013-Ohio-5821, ¶ 32 ("[B]ecause the trial court failed to apply R.C. 2921.331(D), [the defendant's] original sentence was void. Once this error became apparent to the trial court at the resentencing hearing, the trial court was obligated to correct it.").

{¶ 84} In this case, however, the concurrent sentence originally imposed in Case No. CR-20-658077-A was not "void" as that term is currently defined.  In *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248, and *State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776, the Supreme Court of Ohio realigned its precedent with the traditional understanding of what constitutes a void judgment.  *Harper* at ¶ 4; *Henderson* at ¶ 34.  "Based on *Harper* and *Henderson*, the current void-sentence jurisprudence of the Ohio Supreme Court is clear: if the sentencing court has subject-matter jurisdiction over the case and personal jurisdiction over the defendant, any sentencing error renders the sentence

voidable, not void." *State v. Stansell*, 8th Dist. Cuyahoga No. 109023, 2021-Ohio-2036, ¶ 11 (en banc). If a sentencing error renders the defendant's sentence voidable, the error must be challenged on direct appeal, or the sentence will be subject to res judicata. *Harper* at ¶ 43. It similarly follows that if a sentencing error renders the defendant's sentence voidable, the trial court no longer retains continuing jurisdiction to correct the sentencing error. *See State v. Sailor*, 8th Dist. Cuyahoga No. 109459, 2021-Ohio-2277 ¶ 20 ("The trial court lacked jurisdiction to modify the final sentence because there was no other basis cited to invoke the trial court's continuing jurisdiction over the final entry of conviction."); *State v. Merritt*, 1st Dist. Hamilton No. C-200351, 2021-Ohio-3122, ¶ 12 ("Nor could the court have granted relief under its jurisdiction to correct a void sentence, because the alleged sentencing errors would not have rendered Merritt's sentences void.").

{¶ 85} In this case, there is no dispute that the trial court had both subject-matter jurisdiction over Bryant's case and personal jurisdiction over him. R.C. 2931.03; *Smith v. Sheldon*, 157 Ohio St.3d 1, 2019-Ohio-1677, 131 N.E.3d 1, ¶ 8 Accordingly, trial court's decision to run the sentences imposed in each case concurrently, and its failure to comply with R.C. 2929.14(C)(1)(a) and 2921.331(D) when originally imposing the sentence in Case No. CR-20-658077-A, rendered the sentence voidable, not void.

{¶ 86} Rather than pursuing a direct appeal to address the trial court's sentencing error, the state urged the trial court to reconvene and "clarify" that Bryant would have to serve portions of his sentence in Case No. CR-19-646608-A

before his sentence in Case No. CR-20-658077-A could commence. As previously stated, however, we reject the assertion that the court's actions on December 21, 2021, amounted to a clarification of the previously imposed sentence. To the contrary, the court's attempt to retroactively enforce the consecutive-sentence requirements of R.C. 2929.14(C)(1)(a) and 2921.331(D) conflicted, significantly, with the trial court's statement during the original sentencing hearing that the entirety of the sentence imposed in Case No. CR-20-658077-A would run concurrently with the sentences imposed in Case No. CR-19-646608-A.

{¶ 87} Because the trial court lacked jurisdiction to correct the voidable sentencing error, we find the court's imposition of an aggregate prison term of "six years and nine months" is a nullity. Furthermore, because the state invited the nullity and has not challenged the trial court's failure to comply with R.C. 2929.14(C)(1)(a) and 2921.331(D) at the time of the original sentencing hearing on direct appeal, we are inclined to vacate the January 4, 2022 sentencing journal entry, and order the trial court to reinstate the sentence journalized on December 18, 2021.

{¶ 88} Bryant's third assignment of error is overruled in part and sustained in part.

{¶ 89} Judgment affirmed in part and reversed in part. On remand, the trial court is ordered to issue a nunc pro tunc journal entry to adequately reflect the sentence imposed at the time of sentencing in Case No. CR-19-646608-A. In

addition, the trial court is ordered to vacate the nunc pro tunc journal entry issued in Case No. CR-20-658077-A, and reinstate the original sentencing journal entry.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY J. BOYLE, J., CONCUR

N.B. Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.